**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**
**AT KANSAS CITY**

| | | |
|---|---|---|
| **ROSANN CASTRO,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No.** |
| | ) | |
| **DOT'S PRETZELS, LLC** | ) | |
| | ) | **REQUEST FOR JURY TRIAL** |
| | ) | |
| | ) | |
| **and** | ) | |
| | ) | |
| **PINNACLE STAFFING GROUP KS, LLC,** | ) | |
| | ) | |
| **Defendant,** | ) | |
| | ) | |

Serve Dot's Pretzels, LLC:          Serve Pinnacle Staffing Group KS, LLC:
Registered Agent                           Registered Agent
Corporation Service Company        Brad Tyler
2900 SW Wanamaker Dr., Ste. 204   1311 East Santa Fe
Topeka , KS 66614                         Olathe, KS 66061

## <u>COMPLAINT</u>

COMES NOW, Plaintiff Rosann Castro, by and through undersigned counsel, and for her

claims against Defendants Dot's Pretzels, LLC ("DP") and Pinnacle Staffing Group KS, LLC,

("PSG") states as follows:

1.      Plaintiff is a 59-year-old female and resident of the State of Missouri.

2.      Defendant DP is a foreign entity, properly registered with the Kansas Secretary of

State; does business in Kansas; and can be served through its registered agent, Corporation

Service Company, 2900 SW Wanamaker Dr., Ste. 204, Topeka, Kansas, 66614.

3.      Defendant PSG is a limited liability company, properly registered with the Kansas

Secretary of State, and in good standing; organized under the laws of Kansas with its principal

place of business in Kansas; and can be served through its registered agent, Brad Tyler, 1311 East Santa Fe, Olathe, KS 66061.

4.    This case involves four intentional torts:

    a.   Retaliation in violation of public policy, specifically the Kansas Workers' Compensation Act, arising under Kansas common law;

    b.   Age discrimination in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621, *et seq.*;

    c.   Disability discrimination in violation of the Americans with Disabilities Act, as Amended ("ADAAA"), 42 U.S.C.§§ 12101, *et seq.*; and

    d.  Retaliation in violation of ADAAA.

5.    Plaintiff was hired by Defendant PSG in Johnson County, Kansas.

6.    Plaintiff was placed by Defendant PSG at Defendant DP's plant located in Lenexa, Kansas.

7.    At all times, Plaintiff worked at Defendant DP's plant located in Lenexa, Kansas.

8.    Plaintiff was required to report directly to Defendant DP regarding her attendance, her work, and virtually every other aspect of employment.

9.    Defendant PSG coordinated Plaintiff's payment and other benefits.

10.    Thus, Defendants DP and PSG were Plaintiff's joint employers. *See Sizova v. Nat'l Inst. of Standards & Tech.*, 282 F.3d 1320, 1330 (10th Cir. 2002).

11.    Plaintiff was subjected to adverse employment actions while at work in Lenexa, Kansas.

12.     At all relevant times, Defendant DP employed more than twenty people and was engaged in an industry affecting commerce, specifically, manufacturing products which are sold nationwide.

13.     At all relevant times, Defendant PSG employed more than twenty people and was engaged in an industry affecting commerce, specifically, placing employees in positions such as the position at Defendant DP, in which employees would assist in manufacturing products sold throughout the United States.

14.     Defendants are therefore each an "employer" within the meaning of the ADEA, pursuant to 29 U.S.C. § 630(b), and the ADAAA, pursuant to 42 U.S.C. § 12111(5).

15.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, as Counts II and III of Plaintiff's Complaint arises under the laws of the United States, specifically the ADEA (Count II) and the ADAAA (Counts III and IV).

16.     This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over Count I of Plaintiff's Complaint, as that count is so related to the claims encompassed within Counts II - IV as to form one case or controversy.

17.     Defendants are each covered "employers" under the Kansas Workers Compensation Act.

18.     These facts make jurisdiction and venue of this case proper in this Court.

## FACTS COMMON TO ALL COUNTS

19.     Plaintiff learned about the position with Defendant DP and Defendant PSG through her daughter, Christina Castro, an employee of only Defendant DP.

20.     Plaintiff applied for employment with Defendant PSG and concurrently requested placement at Defendant DP.

21.     Defendant PSG would supply workers to Defendant DP on a temporary basis.

22.     The temporary employee would put in 300 hours at Defendant DP's facility.

23.     At or before the completion of 300 work hours, Defendant DP would decide whether or not to extend an offer of direct employment to the temporary employee.

24.     The normal practice for placing a temporary employee at Defendant DP's facility involved a direct interview of the candidate by Defendant DP's supervisor staff.

25.     Defendant PSG would schedule an interview with one of its employees in need of an assignment with supervisors of Defendant DP.

26.     Supervisors of Defendant DP would interview the potential temporary employee, and then inform Defendant PSG if Defendant DP wanted to hire the individual as a temporary employee for the "300 hour" trial period.

27.     Upon Plaintiff requesting the assignment at Defendant DP's facility, Plaintiff informed Defendant PSG that her daughter was a current employee of Defendant DP.

28.     Defendant PSG related this information to Defendant DP, and Plaintiff was hired without being directly interviewed by any supervisor of Defendant DP.

29.     Plaintiff first day of work for Defendant DP and Defendant PSG was December 23, 2019.

30.     The first time any supervisor of Defendant DP met or saw Plaintiff was when Plaintiff arrived at the facility that day.

31.     Upon hire, Plaintiff informed Defendants that she had postcholecystectomy syndrome, which results in Plaintiff needing to use the restroom immediately upon the onset of the urge to relieve herself.

32.    Plaintiff had her gallbladder removed which causes postcholecystectomy syndrome.

33.    Plaintiff explained this symptom and was told she would always be able to use the restroom as needed as an accommodation for the medical condition.

34.    Plaintiff was supervised by Jonathan l/n/u, a shift supervisor and employee of only Defendant DP.

35.    Jonathan is in his late-20s.

36.    Similarly, nearly all of the employees at Defendant DP's facility are in their 20s and 30s.

37.    Plaintiff was the oldest Warehouse Associate on her shift.

38.    Upon information and belief, Plaintiff was one of only two Warehouse Associates over the age of 40.

39.    Immediately upon starting, Plaintiff began experiencing problems with Jonathan and her coworkers.

40.    Jonathan was extremely critical of Plaintiff's work, correcting her in very condescending ways.

41.    Jonathan regularly told Plaintiff that she needed to "pick up the pace" and work faster.

42.    Despite Jonathan's near-constant critiques of Plaintiff's pace of work, Plaintiff's work output matched that of her younger coworkers.

43.    Jonathan did not offer similar critiques of the younger employees' pace of work.

44.    Jonathan's singling out and harsh treatment of Plaintiff was palpable.

45.     Several of Plaintiff's coworker's asked Plaintiff if she had done something to Jonathan to cause him to be so aggressive and rude toward Plaintiff.

46.     Despite being unfounded, Jonathan's constant complaints of Plaintiff's work pace influenced the opinions of Plaintiff's coworkers.

47.     In or about late-January or early-February, Jonathan assigned Plaintiff the task of boxing product by herself.

48.     Boxing product involves three distinct tasks: assembling the boxes, filling the box with product from the conveyor belt, and sealing the box.

49.     Due to the speed of the conveyor belt, boxing product is typically a three-person job, with each employee taking a certain part of the process.

50.     Plaintiff did her best to keep up with the conveyor belt, but it was simply too much for a single employee to handle.

51.     Upon seeing Plaintiff struggling with her assigned task, Carl l/n/u, another Warehouse Associate, offered to help Plaintiff.

52.     Plaintiff told Carl she thought Jonathan was giving her difficult tasks to make her quit.

53.     Plaintiff warned Carl that he was going to get in trouble if Jonathan found Carl helping Plaintiff.

54.     Carl responded that Plaintiff's assignment was not fair, and he did not care if he got in trouble.

55.     Upon seeing Carl helping Plaintiff, Jonathan stormed over and demanded that Carl speak with Jonathan privately.

56.     The two men went to another area outside of Plaintiff's earshot.

57.     Upon returning from speaking to Jonathan, Plaintiff asked Carl if he had gotten in trouble.

58.     Carl told Plaintiff that Jonathan yelled at him and told him not to help Plaintiff.

59.     Carl reiterated that he did not care what Jonathan said and that he was not going to let Plaintiff do the task alone.

60.     Upon information and belief, Carl is no longer employed by Defendant DP.

61.     Plaintiff began experiencing negative comments from her coworkers regarding her age and pace of work.

62.     One employee, Caitlyn l/n/u, stated in Plaintiff's presence: "I would never want an *old person* working with me – they slow everything down."

63.     Plaintiff believes that her coworkers were emboldened by Jonathan's comments and statements to Plaintiff's coworkers that Plaintiff was a "slow" worker.

64.     Jonathan continued giving Plaintiff less favorable job assignments.

65.     One such task included cleaning and stocking the restrooms.

66.     Plaintiff was assigned this task much more frequently than her younger coworkers were.

67.     When Plaintiff questioned why she was being assigned to clean the restroom so frequently, Jonathan replied that it was "something more your pace."

68.     On or about February 23, 2020, Plaintiff was completing her assigned shift when she was approached by a coworker.

69.     This coworker had been assigned to clean and stock the restrooms.

70.     The employee had not done this assignment in the past, but knew that Plaintiff frequently completed the task.

7

71.     The employee asked Plaintiff which cleaning agent was used to mop the floors and how to replace the toilet paper rolls.

72.     As Plaintiff was explaining the differences between the cleaning agents, Jonathan began yelling: "Rose! Rose!"

73.     Jonathan walked up and sharply snapped at the coworker: "Don't ever talk to Rose, she is easily distracted."

74.     Jonathan's comment made Plaintiff very embarrassed and singled-out in front of her coworker.

75.     Plaintiff was offended that Jonathan had deliberately and baldly instructed one of Plaintiff's coworkers not to talk to her, even about work assignments.

76.     At the end of her shift, Plaintiff sent a text message to Defendant DP's Plant Manager, Kent Schmidtberger.

77.     Plaintiff expressed concern and requested a meeting with Schmidtberger to discuss her work environment.

78.     Schmidtberger informed Plaintiff that she needed to talk to Jonathan before talking to Schmidtberger.

79.     Plaintiff explained to Schmidtberger that her problems were with Jonathan, and she did want to make her complaints to her harasser.

80.     Plaintiff described Jonathan's harsh treatment of her, explaining that her work environment had grown hostile at the hands of Jonathan.

81.     Schmidtberger told Plaintiff that Jonathan, Plaintiff and Schmidtberger would have a meeting to discuss the issues that Friday, February 28.

82.     Schimdtberger never had that meeting with Plaintiff and Jonathan.

8

83.     Schimdtberger would never have meeting with Plaintiff about her complaints.

84.     The week of March 2, 2020, Plaintiff realized that she had accumulated the 300 hours required to receive a job offer from Defendant DP.

85.     Plaintiff attempted to confirm her hours with Schimdtberger, he informed Plaintiff that Defendant PSG was in charge of tracking Plaintiff's hours, not Defendant DP.

86.     Schimdtberger told Plaintiff that Defendant PSG would notify Plaintiff and Defendant DP via e-mail once she hit the requisite 300 hours.

87.     Plaintiff contacted PSG to inquire about her hours.

88.     Plaintiff spoke to Lisa l/n/u about the hours.

89.     Lisa informed Plaintiff that Schimdtberger was wrong.

90.     Lisa informed Plaintiff that the standard procedure was for Defendant DP to notify Defendant PSG as the employee approached completion of the 300 hours.

91.     Lisa informed Plaintiff that Defendant DP would normally inform Defendant PSG if Defendant DP was extending an offer of employment to the employee or ending the employee's assignment.

92.     Lise told Plaintiff that after an offer is extended, Defendant PSG would take the employee off of Defendant PSG's roster, but the employee's job would otherwise stay the same.

93.     Lisa told Plaintiff that, based on this procedure, Plaintiff might start working directly for Defendant DP without realizing it.

94.     Plaintiff felt relieved and thanked Lisa for the information.

95.     Plaintiff continued to work the rest of that week.

96.     The following week, Plaintiff was working with Caitlyn when Plaintiff began experiencing the urge to urinate.

97.     Plaintiff told Caitlyn that Plaintiff had to go to the restroom.

98.     Caitlyn protested, telling Plaintiff that Plaintiff had to wait for a scheduled break.

99.     Plaintiff explained to Caitlyn that Plaintiff had a health condition.

100.    Plaintiff explained that she had notified Defendant DP of her health condition.

101.    Plaintiff explained that she had always been allowed to use the restroom whenever she needed, even outside of regular breaks.

102.    Caitlyn responded, simply, "Well, it sounds like you're sick."

103.    Plaintiff reiterated that Jonathan and other supervisors of Defendant DP were aware of Plaintiff's condition and had permitted Plaintiff to use the bathroom whenever she needed.

104.    Caitlyn shrugged and told Plaintiff that Plaintiff was not allowed to take extra breaks to use the restroom.

105.    Caitlyn told Plaintiff that if Plaintiff really needed these breaks, Plaintiff was "sick" and needed to go home sick.

106.    Frustrated and confused by the interaction, Plaintiff did as she was instructed, stopping her work, using the restroom, and then clocking out.

107.    On March 15, 2020, Plaintiff was assigned a task which involved cleaning with very hot water and chemical agents.

108.    Having never completed this particular task before, Plaintiff was receiving training from a coworker on the proper way to complete the task.

109.    The employee training Plaintiff informed Plaintiff that she only needed gloves if Plaintiff "didn't like hot water."

110.    Through normal life experience, Plaintiff has never had any problems with skin sensitivity to hot water, so Plaintiff did not wear gloves.

111.    The training employee did not tell Plaintiff that the chemical she would be using was corrosive to the skin or dangerous.

112.    Plaintiff performed the task using the chemical and did not notice any adverse effects or pain.

113.    However, after performing the task, Plaintiff noticed that her hand was red and slightly swollen.

114.    Plaintiff continued to work, but her hand stayed red and swollen.

115.    Plaintiff found Jonathan and showed him her hand.

116.    Jonathan informed Plaintiff that the chemical agent with which she had been cleaning was an abrasive substance.

117.    Plaintiff explained that the trainer did not inform her that the chemical was abrasive.

118.    Plaintiff explained that she had only been warned that the water would be hot and that she was told gloves were not required unless Plaintiff "didn't like hot water."

119.    Plaintiff told Jonathan that she wanted to try to "walk it off" and finish her shift.

120.    Despite the redness, swelling, and discomfort in her hand, Plaintiff finished her shift without incident.

121.    When Plaintiff awoke the following day on March 16, 2020, her hand was extremely swollen, to the point that she was unable to form a fist.

122.    Plaintiff went to an urgent care clinic and was sent to an emergency room due to the extent of the injury.

123.    Plaintiff went to an emergency room and was informed that she needed to notify her employer since the injury occurred at work.

124.    Plaintiff then called Lisa at Defendant PSG to inform her about the injury and what the emergency room had told Plaintiff.

125.    Lisa provided Plaintiff with paperwork to complete.

126.    Defendant PSG then sent Plaintiff to Concentra for authorized medical treatment.

127.    Plaintiff was placed on full off-duty work restrictions for the next week.

128.    On March 17, 2020, two days after her injury, Plaintiff was informed by her daughter, Christina, that Defendant DP had removed Plaintiff from following week's schedule as well.

129.    Christina informed Plaintiff that the day supervisor, Casey l/n/u, said that Plaintiff had been discharged due to attendance and "Covid."

130.    Plaintiff had been provided no notice of her discharge from Defendant DP or Defendant PSG.

131.    Plaintiff immediately called Schmidtberger and asked about her employment status.

132.    Schmidtberger informed Plaintiff that Defendnat DP had discharged Plaintiff because she had worked over the 300 hours and had "too many absences."

133.    Plaintiff pleaded with Schimdtberger that she did not have any absences beyond the three allotted absences.

134.    Plaintiff continued that her last absence was when Caitlyn sent her home, despite Plaintiff's ability to finish her shift.

135.    Schmidtberger began stammering and stumbling over his words, providing no substantive response to Plaintiff's factual assertions.

136.    Schmidtberger replied: "Well, that last one didn't even matter because we decided to let you go two weeks ago."

137.    Plaintiff was very confused by Schimdtberger's statements, because without counting Plaintiff's most recent absence, Plaintiff would not have yet reached the total number of absences allotted to temp-to-hire employees.

138.    Schmidtberger then ended the call.

139.    Following her release to full duty, Plaintiff began applying for new assignments with Defendant PSG.

140.    Defendant PSG told Plaintiff that, because of COVID-19, jobs were fairly limited, but Plaintiff should keep contacting Defendant PSG to look for work.

141.    On or about June 17, 2020, Plaintiff duly filed a timely Charge of Discrimination (hereinafter "First Charge") with the Equal Employment Opportunity Commission ("EEOC") and Kansas Human Rights Commission (KHRC), alleging that Defendant DP engaged in the discriminatory actions that are being raised in this lawsuit, or alternatively, all conduct alleged herein would have arisen from the investigation of such Charge of Discrimination.

142.    Following the filing of this First Charge, Plaintiff continued to contact Defendant PSG.

143.    However, representatives of Defendant PSG told Plaintiff that it did not believe it would have any jobs for Plaintiff in the future.

144.    Plaintiff found this extremely odd, as many assignments seemed to be available for other workers.

145.    On or about July 23, 2020, Plaintiff duly filed a timely Charge of Discrimination (hereinafter "Second Charge") with the Equal Employment Opportunity Commission ("EEOC") and Kansas Human Rights Commission (KHRC), alleging that Defendant PSG engaged in the discriminatory actions that are being raised in this lawsuit, or alternatively, all conduct alleged herein would have arisen from the investigation of such Charge of Discrimination

146.    Two Notice of Right-to-Sue letters, each dated September 2, 2020, have been issued, and this action is being brought within ninety (90) days from the issuance of such Right-to-Sue letter from the EEOC.

147.    Plaintiff has fulfilled all conditions precedent to the bringing of her claims and has duly exhausted all administrative procedures prior to instituting this lawsuit in accordance with the law.

### COUNT I - RETALIATION IN VIOLATION OF PUBLIC POLICY
### (KANSAS WORKER'S COMPENSATION ACT)
### (Against Defendant PSG)

148.    Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 147 of her Complaint, as though fully stated herein.

149.    Plaintiff exercised rights granted by the Kansas Worker's Compensation Act.

150.    These rights included but are not limited to receiving medical treatment, convalescence, and seeking additional workers' compensation benefits.

151.    Defendant PSG took adverse employment actions against Plaintiff, including but not limited to, not placing Plaintiff in another position.

152.    Defendant PSG's adverse actions taken against Plaintiff were based upon, and directly related to, Plaintiff exercising her rights granted by the Kansas Worker's Compensation Act.

153.    Defendant PSG's adverse actions against Plaintiff violate State public policy clearly declared by the Kansas Courts and the Kansas Legislature.

154.    The conduct of Defendant PSG was willful, wanton conduct that demonstrates malice.

155.    As a direct and proximate result of Defendant PSG's unlawful conduct, Plaintiff has suffered irreparable injury, including past and future pecuniary issues, loss of employment opportunities, emotional pain, suffering, humiliation, inconvenience, mental anguish, and loss of enjoyment of life, and will continue to suffer the same unless and until this Court grants relief.

156.    An award of punitive and exemplary damages is appropriate.

WHEREFORE, Plaintiff prays for judgment against Defendant PSG for compensatory damages in an amount exceeding $75,000.00; for punitive damages; for Plaintiff's costs and expenses occurred herein; and for such other and further consideration and relief as the Court may deem just and equitable.

## COUNT II—AGE DISCRIMINATION INCLUDING HOSTILE WORK ENVIRONMENT IN VIOLATION OF THE ADEA
### (Against all Defendants)

157.    Plaintiff incorporates by reference the allegations contained in Paragraphs 1 through 156 of her Complaint, as though fully stated herein.

158.    Plaintiff was over the age of forty at all times relevant to this lawsuit.

159.    During her employment with Defendants, Plaintiff was subjected to adverse treatment of a continuing nature.

160.    This conduct was committed by and through supervisory employees of Defendant DP.

161.    Plaintiff also experienced additional hostility from coworkers.

162.    This conduct created an intimidating, hostile, and/or offensive work environment.

163.    Despite having actual and constructive knowledge of this conduct, Defendants each failed to take prompt remedial action to correct and prevent such behavior.

164.    Defendant DP took adverse employment actions against Plaintiff, including but not limited to, assigning Plaintiff the most undesirable tasks with more frequency than her younger coworkers; assigning Plaintiff, solely, tasks which required multiple Associates; subjecting Plaintiff to a hostile work environment; refusing to hire Plaintiff directly; and ending Plaintiff's work assignment at its facility.

165.    This harassment was not an isolated incident, but a severe and pervasive pattern of hostility that impacted terms, conditions, and privileges of Plaintiff's employment.

166.    This discrimination was so severe that it rendered Plaintiff's working conditions objectively intolerable.

167.    Defendant PSG also took adverse employment actions against Plaintiff, including but not limited to, refusing to place Plaintiff in other employment.

168.    A/the motivating factor in the adverse actions taken against Plaintiff, including, subjecting Plaintiff to a hostile work environment, refusing to offer Plaintiff a direct hire position, discharging Plaintiff, and refusing to place Plaintiff in other employment, was Plaintiff's age.

169.    As a direct and proximate result of Defendants' unlawful conduct, including, harassing Plaintiff, eliminating Plaintiff's hours, discharging Plaintiff, and refusing to place her in other employment, Plaintiff has suffered irreparable injury, including past and future pecuniary issues, loss of employment opportunities, loss of employment benefits, and will continue to suffer the same unless and until this Court grants relief.

170.    The conduct of Defendants was willful, entitling Plaintiff to an award of liquidated damages.

171.    Plaintiff is also entitled to recover all her costs, expenses, expert witness fees, and attorney's fees incurred in this matter.

WHEREFORE, Plaintiff prays for judgment against Defendant for economic damages in an amount exceeding $75,000.00; for liquidated damages in an equal amount; for Plaintiff's costs, expenses, and attorney's fees incurred herein; and for such other and further consideration and relief as the Court may deem just and equitable.

## COUNT III—DISABILITY DISCRIMINATION IN VIOLATION OF THE ADAAA
### (Against all Defendants)

172.    Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 171 of her Complaint, as though fully stated herein.

173.    Plaintiff suffered from a physical impairment that limited Plaintiff from life activities, including the ability to maintain employment and the ability to work for extended periods of time without a short restroom break.

174.    Defendants further regarded Plaintiff as suffering from another physical impairment that limited Plaintiff from life activities, including the ability maintain employment.

175.    In reality, Plaintiff could at all times perform the essential job functions of her position with or without reasonable accommodations.

176.    Therefore, the Plaintiff had a "disability" under 42 U.S.C. § 12102(1).

177.    Defendant DP took adverse employment actions against Plaintiff, including but not limited to, harassing Plaintiff, punishing Plaintiff by sending Plaintiff home for requesting to use the restroom in accordance with her reasonable accommodation, punishing Plaintiff for being sent home in response to her request to utilize a reasonable accommodation, subjecting Plaintiff

to a hostile work environment, refusing to hire Plaintiff directly, and ending Plaintiff's work assignment at its facility.

178.    Defendant PSG took adverse employment actions against Plaintiff, including but not limited to, refusing to place Plaintiff in other employment.

179.    A/the motivating factor in these adverse employment actions was Plaintiff's disability, including disability wrongfully attributed to Plaintiff by Defendants.

180.    Defendants' conduct was willful and wanton and demonstrates malice.

181.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered irreparable injury, including past and future pecuniary losses, emotional pain, suffering, humiliation, inconvenience, mental anguish, loss of enjoyment of life, reduced employment opportunities, and will continue to suffer the same unless and until this Court grants relief.

182.    An award of punitive and exemplary damages is appropriate.

183.    Plaintiff is also entitled to recover all of her costs, expenses, expert witness fees, and attorneys' fees incurred in this matter.

WHEREFORE, Plaintiff prays for judgment against Defendant for compensatory damages in an amount exceeding $75,000.00; for punitive damages; for Plaintiff's costs and expenses incurred herein; for attorneys' fees; and for such other and further consideration and relief as the Court may deem just and equitable.

## COUNT IV—RETALIATION IN VIOLATION OF THE ADAAA
### (Against all Defendants)

184.    Plaintiff incorporates by reference the allegations contained in Paragraphs 1 through 183 of her Complaint, as though fully stated herein.

185.     Plaintiff engaged in activity protected by the ADAAA and ADEA, including but not limited to requesting and utilizing reasonable accommodations and complaining to management about a hostile work environment.

186.     Defendant DP took adverse actions against Plaintiff, including but not limited to punishing Plaintiff by sending Plaintiff home for requesting to use the restroom in accordance with her reasonable accommodation, punishing Plaintiff for being sent home in response to her request to utilize a reasonable accommodation, subjecting Plaintiff to a hostile work environment, refusing to hire Plaintiff directly, and ending Plaintiff's work assignment at its facility.

187.     Defendant PSG took adverse actions against Plaintiff, including but not limited to, refusing to place Plaintiff in other employment.

188.     Defendants' adverse actions taken against Plaintiff were each based upon, and directly related to, Plaintiff's protected activities.

189.     The conduct of Defendants was willful, wanton conduct that demonstrates malice.

190.     As a direct and proximate result of Defendantss' unlawful conduct, Plaintiff has suffered irreparable injury, including past and future pecuniary losses, emotional pain, suffering, humiliation, inconvenience, mental anguish, loss of enjoyment of life, reduced employment opportunities, and will continue to suffer the same unless and until this Court grants relief.

191.     An award of punitive and exemplary damages is appropriate.

192.     Plaintiff is also entitled to recover all of her costs, expenses, expert witness fees, and attorneys' fees incurred in this matter.

WHEREFORE, Plaintiff prays for judgment against Defendants for compensatory damages in an amount exceeding $75,000.00; for punitive damages; for Plaintiff's costs and

expenses incurred herein; for attorneys' fees; and for such other and further consideration and relief as the Court may deem just and equitable.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff requests a trial by jury in the United States District Court for the District of Kansas, to be held at the Robert J. Dole Federal Courthouse in Kansas City, Kansas, on all accounts and allegations of wrongful conduct alleged in this Complaint.


Respectfully submitted,


_/s/ Daniel L. Doyle_____
Daniel L. Doyle, KS Bar No. 11260
Robert A. Bruce, KS Bar No. 28332
DOYLE & ASSOCIATES LLC
748 Ann Avenue
Kansas City, Kansas  66101
Telephone:  (913) 371-1930
Facsimile:  (913) 371-0147
d.doyle@ddoylelaw.com
r.bruce@ddoylelaw.com
**ATTORNEYS FOR PLAINTIFF**